JOHNATHAN L. BOOTH, JOSEPH B. SPRAGUE AND MARIA L. ASHLEY, PLAINTIFFS, v. THE CLEVELAND ROLLING MILLS COMPANY AND OTHERS, DEFENDANTS.

*Condition — promise, when implied from — Sealed instrument.*

Where a contract contains a condition which it is the duty of one of the parties to it to perform, and which the other party is interested in having performed, the law will imply a promise to perform it, and will sustain an action by the injured party to obtain compensation for a breach of it.

In instruments not under seal, promises not covenants are implied; and a promise will be implied under the same circumstances, under which a covenant would be implied if the instrument were under seal.

MOTION for a new trial on exceptions, ordered to be heard in the first instance at the General Term, after a nonsuit directed by the court.

The action was brought to recover the damages sustained by the plaintiffs, in consequence of the failure of the defendants to manufacture and sell steel rails in pursuance of a contract entered into with the plaintiffs.

*James Breck Perkins,* for the plaintiffs.

*Geo. F. Danforth,* for the defendants.

MULLIN, P. J.:

The plaintiffs were owners of a patent for the manufacture of a rail for use on railroads, known as Booth's patent duplex safety steel and iron rail, and on the 1st of June, 1869, they entered into an agreement in writing with the defendants, in and by which the plaintiffs agreed to give to the defendants a full license to manufacture said rail in the States of Ohio, Indiana and Illinois, said license to continue during the running of said patent, and of all renewals thereof, and of all improvements upon such patent, and to all patents for machinery for the manufacture of said rails, such license to be exclusive in said States, with a single exception, not material to be further referred to; such license to continue as long as the defendant should supply the demand for such rail in

said States. All rails were to be of good material and made in a workmanlike manner, and according to plaintiffs' directions. The plaintiffs, reserved the right to inspect all rails made before delivery to the purchaser. The said license was given on the following conditions :

First. The defendants to pay a royalty of two dollars and fifty cents on each ton for the first 7,000 tons manufactured, payable on the fifteenth of each month for the month preceding.

Second. The defendants to give plaintiffs notice of any contemplated delivery of any quantity of rails, so that they may inspect the same if they desire.

Third. All defective rails, if any such were delivered, to be sold as such, and not as first quality, and the purchaser must be . informed of their inferior quality.

Fourth. The royalty on defective rails to be one-half of that payable on perfect rails.

Fifth. Defendants to keep true accounts of all deliveries of said rails, and such accounts are to be open at all times to the inspection of the plaintiffs or their agents.

It was further agreed between the parties that plaintiffs should send to defendants, at Cleveland, all machinery, tools, etc., then in their possession at Rochester, for the manufacture of said rails, the value thereof to be agreed on between the parties, and if they could not agree, then an umpire to be selected. The ownership of the machinery, etc., was to be in the plaintiffs, until the defendants should have completed 7,000 tons of rails, and then said property to belong to defendants, and be paid for by them. The defendants were to proceed at once to make said rails in Cleveland, and within a reasonable time in Chicago, and to use all proper effort and due diligence to introduce and sell said rails ; no other rail made by them to receive more attention or interest than the Booth rail, so long as said rail holds good as a practical and reliable rail for use. No other manufacturers in the United States shall have the right to manufacture said rail, at any less royalty than is paid by defendants.

It was further agreed that when the royalty is reduced by reason of defect in the rail, the rail shall be sold at a less price, and parties purchasing such defective rails should be prohibited from laying

them upon any main line or track of any road, and the purchaser of such rails must give to the defendant a written obligation agreeing to be responsible, and be treated as using said rails without authority, and infringing of the said patents, and liable for all damages as such infringers. The purchase of said second class rails does not permit their use on main line tracks, but only side tracks, yards, and places where fast trains are not run.

On the day of the date of the last mentioned contract, the parties made another agreement, in which it was recited that the plaintiffs had sold, and did thereby sell and grant unto the defendants the right, license and privilege to manufacture said rails in the States in former contract mentioned, so long as they shall supply the demand for said improvement in rails in the said States, paying the royalty aforesaid, and otherwise conforming to all the obligations in said agreement, with the same exceptions as is contained in said first mentioned contract. The remaining provisions of the agreement have no bearing upon the rights or obligations of the parties in this action.

The breaches of said contract for which damages are sought in the action, are:

First. That the rails manufactured by defendants, under said contract, were not made of good material, nor in a workmanlike manner, according to the direction of said plaintiffs.

Second. Defendants have not made proper efforts and used due diligence, to introduce and sell such rails.

Third. They have neglected and refused to manufacture such rails or to fill orders or supply the demand therefor, and have given greater attention to other rails.

Fourth. Defendants have refused to fill an order of the Lake Shore and Michigan Southern Railroad Company for 4,000 tons of plaintiffs' rails, on which plaintiffs would have received a royalty of $10,000.

Fifth. Defendants have also refused to fill other orders for such rails.

Sixth. Defendants have not paid for the machinery sent by plaintiffs to them pursuant to said contract, notwithstanding they made and delivered 3,000 tons of rails, and had orders for enough

more to make up 7,000 tons, when, by the terms of the contract, the defendants were bound to pay for said machinery.

On the trial the plaintiffs proved the contract, and that after making the same plaintiffs sent the machinery they had at Rochester to defendants at Cleveland, and they made no more rails thereafter. The plaintiff Booth called the attention of defendants' president to the provisions of the contract as to the selection of arbitrators, who said there would be no difficulty in their agreeing on the price. Defendants manufactured rails, under the contract, up to 28th January, 1871, when an account of the quantity made and sold was given to plaintiffs. The amount was 3,046 tons, on which the royalty was paid. That the Lake Shore and Michigan Southern Railroad Company made a contract with defendants for the purchase of some 4,100 tons of the Booth rail, in 1870 and 1871, of which about 2,000 tons were delivered, and the residue was not delivered.

It was also proved that contract was made between defendants and the Chicago, Rock Island and Pacific Railroad Company for the sale, to the latter, of 1,000 tons of the Booth rail, which the purchasers refused to receive because they were not shipped in time.

The plaintiffs offered to prove that the company last named refused to receive the iron because it was defective, and that the rails made by defendants were not made in a workmanlike manner.

The evidence was objected to by defendants' counsel, and it was excluded, and plaintiffs' counsel excepted.

The plaintiffs' counsel also offered to prove that defendants gave more attention to other rails manufactured by them, than they gave to the Booth rail, and that they filled the contract with the Lake Shore road by delivering solid steel rails. This offer was objected to by defendants' counsel. The objection was sustained, and plaintiffs' counsel excepted. The plaintiffs' counsel offered to prove that during all the time of the running of the license the Booth rail continued to be a good, practicable and reliable rail. The offer was objected to by defendants. The objection was sustained and plaintiffs' counsel excepted. The plaintiffs' counsel rested.

The defendants' counsel moved for a nonsuit. The court granted the motion, on the ground that there was no covenant to manufacture rails. To this ruling and decision plaintiffs' counsel excepted.

If it be the law that the contracts between the parties are a

mere license to the defendants to make and vend the Booth rail, and that the plaintiffs' only remedy for a breach of the condition in the contract was to revoke the license, and that no action can be maintained against defendants for a breach of such condition, then the plaintiffs were rightly nonsuited, and a new trial must be denied; but if, on the contrary, the law will imply a promise on the part of the defendants to perform some or all of said conditions, the nonsuit was erroneous and a new trial must be granted.

That the plaintiffs could revoke the license, in the event of defendants' neglecting to comply with the conditions of said contract, is not to be doubted, but was this plaintiffs' only remedy? It seem to me not.

By the contract defendants were to manufacture rails from good material and in a workmanlike manner. If they did not, the reputation of the rail was injured, the sale lessened, and the royalty, which the plaintiffs would have been entitled to receive, also lessened.

It was not, I am quite sure, the understanding and intention of the parties, that the plaintiffs' remedy for a breach of the contract should be limited to a revocation of the license.

The plaintiffs relinquished the manufacture of the rail, and transferred not only the right to manufacture them to the defendants, but also the machinery they had used in manufacturing them. They received in return only so much as royalty, as it suited the interest or convenience of the defendants to earn. An account of sales was to be rendered once in each month for at least one month, therefore defendants might omit altogether to manufacture rails, or could manufacture worthless ones before plaintiffs· could obtain the information necessary to justify them in revoking the license.

I think the law is, that when a contract contains a condition which it is the duty of one of the parties to it to perform, and the other party has an interest in having it performed, the law will imply a promise by the party to perform it, and will sustain an action by the injured party to obtain compensation for a breach of it. (*Roberts* v. *Marston*, 20 Me., 275.) In *Phelps* v. *Townsend* (8 Pick., 392), the defendant, by a writing signed by him, placed his son with the plaintiff to learn the printer's trade until he was twenty-one

years of age,. and agreed to pay plaintiff a certain amount if the boy did not stay with him four months after he became twenty-one. The boy went to live with plaintiff, and was taught the trade until he became twenty-one, when he left. The action was brought on the contract to recover the amount agreed by defendant to be paid, and a recovery was resisted on the ground that there was no mutuality in the contract, as plaintiff had not agreed to instruct the boy. in the business of printing; but the court held that plaintiff having accepted the contract and executed it in part, an obligation on his part to teach and maintain the boy was created.

The same principle was applied by the same court, in *Hubbard* v. *Coolidge* (1 Metc., 84). In *McIntyre* v. *Belcher* (14 C. B. [N. S.], 654), the action was to recover a certain sum that defendant had agreed to pay plaintiff, for their drugs in an apothecary shop they had carried on, and also for the practice of the plaintiff, as a physician for a certain portion of the earnings in each year, for four consecutive years, if he should be living in each year. It was shown on the trial that defendant had by his own act disabled himself from further carrying on his business, and had abandoned his business ; it was held that it was an implied covenant in the agreement, that the defendant would not during the four years, by his own wilful acts or default, prevent the receipt of earnings. (1 Chitty on Con. [11th Am. ed.], 80 and notes; Same, 88, 89.)

The Queen's Bench, in *Sterling* v. *Maitland* (5 B. & S., 849), held that if a party enters into an agreement which can only take effect by the continuance of a certain existing state of circumstances, there is an implied engagement on his part that he should do nothing, of his own motion, to put an end to that state of circumstances, under which the arrangement can be operative. It is said in Taylor Landlord and Tenant (§ 251), that a license if under seal may take effect as a covenant, as when it authorizes the party, to whom it is made, to go upon the land of the party granting it, and use the land for his own profit, the license would be equivalent to a lease ; or it may be limited to some particular purpose as to cut wood or draw water, and in either case would be supported as a covenant. In the same work (§ 252), it is said, a covenant is implied on the part of the lessee, that he will use the land demised to him in a husbandlike manner, and not unnecessarily exhaust the soil by

neglect or improper tillage. And as a consideration is necessary to every contract, it is always implied that the tenant shall pay an annual rent. So a covenant by a lessee to pen and fold the flock of sheep, which he should keep upon the premises, upon those parts of the land where they had usually been folded, was held to imply a covenant to keep a flock of sheep upon the premises.

In instruments not under seal promises not covenants are implied, and the same promise is implied under the same circumstances that a covenant would be implied if the contract were sealed.

If a man hires a horse of a livery stable keeper, the law implies a promise on the part of the hirer to properly feed, kindly treat, and safely return the animal to the owner, unless loss or injury occurred without his fault or neglect. If the owner of property permits another to use it without compensation, a promise is implied that the borrower shall safely keep such property, and return it when the bailment is at an end.

But it is unnecessary to multiply authorities upon a proposition so elementary. I have referred to them, merely to show that it is not necessary, in order to render a party responsible upon a contract, that it should contain an express agreement on his behalf, if by the relations of the parties, and the subject-matter of the contract, a duty is owing from the one not expressly bound by the contract to the other, in reference to the subject of it.

I am of opinion, therefore, that the law implies a promise by the defendant to perform all the conditions of the lease, in the performance of which the plaintiffs have a pecuniary interest, except that which relates to the payment of the price of the machinery.

Defendants' liability to pay for that property is dependent upon two conditions: One is the making of 7,000 tons of the Booth rail, and the ascertainment of the price either by mutual agreement or by arbitration. The defendants did not manufacture 7,000 tons of the rails, and unless the failure to make that quantity was caused by the fault or neglect of the defendants, they are not liable.

Either party could terminate the contract at pleasure, but the defendants, in order to relieve themselves, were bound to give notice of their determination, and return to plaintiffs the machinery. They could not keep silent and omit to make the rails, retain the machinery and deprive plaintiffs of the royalty to which they

would have been entitled, had the defendants, in good faith, performed the contract.

The plaintiffs cannot recover the price of the machinery until the price is ascertained, in one of the ways provided in the contract.

The nonsuit must be set aside and a new trial granted, costs to abide event.

Present — MULLIN, P. J., SMITH and GILBERT, JJ.

Nonsuit set aside and new trial granted.